IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

| | | |
|---|---|---|
| NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, et al., | ) ) ) ) | Case No.: 5:00-CV-100-OC-10 – GRJ |
| Plaintiffs, v. | ) ) ) | |
| STATE OF FLORIDA DEPARTMENT OF CORRECTIONS, et al., | ) ) ) | |
| Defendants. | ) ) ) ) | |

NOTICE OF FILING OF DESIGNATION OF PORTIONS OF DEPOSITION
TESTIMONY OF DR. PAUL WHITE AND INCORPORATION OF PERTINENT
EXHIBITS IN SUPPORT OF PLAINTIFFS' MOTION REGARDING
DR. WHITE'S PROPOSED TESTIMONY [D.E. 820]

Plaintiffs hereby give notice of filing of the designation of the following portions of deposition testimony of Dr. Paul White in support of their Statement Regarding Necessity of Daubert Hearing to Consider Proposed Testimony of the Department's Expert Witness, Dr. Paul White, Motion to Exclude Portions of His Report and of His Proposed Testimony:

### DEPOSITION TESTIMONY

| Page/Line | Subject of Testimony |
|---|---|
| 19/19 – 23/14 | The document review process in March, 2002 included a review of training records. Drs. White and Berkman identified the type of training records to be sought. A clear indication of CJST course (designation) was sought; non-CJST courses were separately listed. |
| 24/24 – 25/19 | Daniel Holloway, Donald Butcher, Karen Calderon, Tracy Ramos, Lisa Thies, Karen Cassleberry and Mark Sanchez were the ERS research assistants or research associates who participated in the review process in March, 2002. |

## DEPOSITION TESTIMONY

| Page/Line | Subject of Testimony |
|---|---|
| 26/14 – 28/6 | ERS staff members reviewed training documents in efforts to distinguish CJST from non-CJST courses. |
| 28/7 – 29/24 | Dr. White is unaware of the functions of the Criminal Justice Standards and Training Commission; does not know if it establishes licensure requirements. |
| 31/8-55/23 | ERS document review process regarding training [through nearly 20 pages of question and answers] is described as consisting of an effort to identify courses that were CJST courses. Intensive internal communications by Dr. White's staff were in an effort to distinguish CJST courses from non-CJST courses, but he did not contact the CJST itself. |
| 55/24-60/18 | In his discussion with David Delifus, Dr. White posed question whether employee selected versus Department assigned was a better distinction than CJST versus non-CJST designation. Dr. White concluded that employee initiated courses were mutually exclusive from employer initiated courses. |
| 61/16-62/19 | His notes dated April 15, 2002 are likely to have been made before he spoke to Mr. Delifus. He found Mr. Delifus through defense counsel in asking about effects of CJST vs. non-CJST designation. |
| 74/8-75/6 | He introduced the subject of distinguishing between employee and employee initiated training in a question he posed to Mr. Delifus. |
| 77/8-10 | He spoke to Mr. Delifus for "maybe half hour." |
| 77/23-79/21 | Using a Venn diagram, Dr. White shows "mutual exclusion" between employee initiated and employer initiated courses, with overlap through one course as a "possible exception." |
| 83/8-11 | All of his training analysis is premised on the distinction between employer and employee-initiated training. |

GREENBERG TRAURIG, P.A.

## DEPOSITION TESTIMONY

| Page/Line | Subject of Testimony |
|---|---|
| 84/24-85/6 | Because the one course representing the possible overlap between employer and employee initiated training no longer is offered, he sees mutual exclusivity between employer and employee-initiated training. |
| 88/7-89/19 | Table C-1 to his report dated May 7, 2002 excludes employees who did not receive an evaluation. |
| 89/20-91/5 | Table C-2 shows that there was a statistically significant difference between the provision of evaluations to blacks and whites, based upon his probability value calculations, using a two-tail analysis. |
| 92/11-20 | The threshold level of significance for a one-tail test is one-half that of the two-tail test. |
| 93/9-20 | It is understandable why someone would use a one-tail test to assess the hypothesis that blacks are evaluated less than whites. |
| 93/21-94/2 | His table C-2 confirms the allegation that blacks receive fewer evaluations than whites. |
| 94/1-18 | There is a statistically significant difference between the number of evaluations given to blacks and whites. |
| 102/8-103/2 | His analysis of evaluations was based upon a linear regression model, Ordinary Least Squares ("OLS"), run through an SPSS software package. |
| 104/19-107/7 | Table C-5 refines the regression analysis done by table C-4 by eliminating variables that would be a proxy for race, i.e. "tainted" variables, and concluded that blacks receive fewer evaluations than whites to a degree that was statistically significant, 2.05 standard deviations. Two standard deviations is "the level used in practice by courts in the legal system." |

## DEPOSITION TESTIMONY

| Page/Line | Subject of Testimony |
|---|---|
| 108/12-109/21 | A Poisson-count analysis is appropriate when trying to measure a dependent variable that is represented by an integer. He saw that type of analysis done in Dr. Berkman's analysis and has no strong objections to it, but sees the choice [between Ordinary Least Squares and Poission-count regression analysis] as a matter of professional judgment. |
| 111/3-112/24 | He recognizes the William Green text on econometric analysis as a leading treatise in the field, and agrees that a Poission-count analysis could improve an ordinary least square analysis, but sees the choice as a matter of professional judgment. |
| 119/23-120/6 | He used an OLS model in analyzing performance evaluations as well as training and discipline. |
| 123/16-124/3 | By his analysis, the average black employee has taken nine one-hundredths of an employer-initiated training course [Table D-1]. |
| 124/4-25 | By his analysis, the average white employee has taken one tenth of an employer–initiated training course. |
| 125/1-16 | Although his Table D-1 shows that blacks take "employee-initiated" training to an extent that is significantly lower than the extent to which whites take such courses, he would not make therefrom the inference (or any inference) that blacks exhibit less initiative in seeking courses than whites. |
| 152/19-126/20 | While not comfortable assigning causation to his findings regarding employer initiated training, his result would be consistent with the inference that blacks exhibit less initiative than whites in seeking training, though other inferences would be drawn as well. |
| 128/12-129/1 | Supervisor approval is needed if training is to be used for a salary additive, but not for permission to take the course. |

GREENBERG TRAURIG, P.A.

## DEPOSITION TESTIMONY

| Page/Line | Subject of Testimony |
|---|---|
| 135/6-137/14 | Employees who are black are disciplined more than employees who are white to an extent that is statistically significant: 2.81 standard deviations, and that figure includes Hispanics with whites. |
| 139/7-23 | His table E-4 shows two categories of discipline where blacks are disciplined more than non-blacks to an extent that is statistically significant. |
| 140/5-142/21 | Too early for him to tell whether he disputes any of Dr. Berkman's findings regarding disciplinary actions as to which blacks are a greater share than whites to an extent that is significant [Exhibit 21]. |
| 143/1-6 | His table E-2 says that black employees have a higher incidence of disciplinary action, but does not support the inference that black employees are more "unruly" than white employees. |
| 148/7-19 | He has not heard an explanation by the Department of the racially disparate discipline reflected by his analysis. |
| 152/23-153/2 | Table E-2 shows a significant difference in the incidence of discipline imposed upon blacks and whites. |
| 153/1-25 | Table E-4 does so as well. |
| 155/21-157-8 | Exhibit 22 shows an odds ratio of .76, which is significant at the 90% confidence level, such that for every 100 white promotions there are 76.7 promotions of similarly situated blacks. |
| 169/18-170/7 | Exhibit 23 is the color version of Exhibit 23, as to "employee initiated training." |
| 172/10-173/4 | Exhibit 24, the Department's staff development [training] rules looks familiar by title, but he does not recall when he saw it or reviewing it in this format. |
| 214/20-215/3 | He and his team agree with Dr. Berkman that the Department's promotional data reflect a big spike in applications in 1995 and he is still looking for an explanation. |

5

## DEPOSITION TESTIMONY

| Page/Line | Subject of Testimony |
|---|---|
| 221/20-223/10 | He knew that the application database was in question, tried to eliminate a tainted variable; table F-5 corrects for that variable. |
| 223/11-225/7 | His staff observed that promotional data showed a series of individuals who applied for between 109 and 319 promotions, thus further indicating that the Department's promotional data are questionable, but says his analysis corrected for the questionable data. |

Respectfully Submitted,

GREENBERG TRAURIG, P.A.
Attorneys for Plaintiffs
515 East Las Olas Boulevard
Suite 1500
Ft. Lauderdale, Florida 33301
Telephone: (954) 768-8262
Telefax: (954) 765-1477

_____
FRANK SCRUGGS
Florida Bar No. 251488
DAVID OLIVER
Florida Bar No. 521922
DOMINIQUE T. SUITE
Florida Bar No. 0885339

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served by facsimile and U.S. Mail to all counsel addressed below on this 12th day of June, 2002.

_____
FRANK SCRUGGS

| | |
|---|---|
| Craig A. Dennis, Esq. | Edward R. Hudson, Esq. |
| William P. Martin, Esq. | Laura Beth Faragasso, Esq., |
| Dennis, Bowman, Jackson, | Henry, Buchanan, Hudson, Suber & Carter, P.A. |
|    Martin & Fontela, P.A. | 117 South Gadsden Street |
| 2367 Centerville Road | Post Office Drawer 1049 |
| Tallahassee, FL 32317-5589 | Tallahassee, FL 32302 |

\\ftl-srv01\SCRUGGSF\386769v01\8@FL01!.DOC\6/10/02\41098.010100